IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CONCEALED CARRY, INC., an Illinois corporation, and JOHN BIRCH, President of Concealed Carry, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF CHICAGO, <br><br> Defendant. | ) ) ) ) ) No. 02 C 7088 ) ) ) Wayne R. Andersen ) District Judge ) ) ) |

## MEMORANDUM, OPINION AND ORDER

This matter comes before the court on defendant City of Chicago's motion for summary [59] judgment filed pursuant to Federal Rule of Civil Procedure 56. The City's motion for summary judgment encompasses plaintiffs' claims under the First and Fourteenth Amendments and 42 U.S.C. §1983. For the reasons set forth below, the City's motion is granted.

## BACKGROUND

Plaintiff Concealed Carry is a corporation organized to advocate the preservation of the Second Amendment right to bear arms, and plaintiff John Birch ("Birch") is the president of Concealed Carry (collectively, "plaintiffs"). The only remaining defendant is the City of Chicago (the "City"). Various other defendants were named in the initial complaint but have since been dismissed as explained below. This case centers around the events that took place during a rally in Chicago's Federal Plaza on Monday, October 7, 2002.

On April 15, 2001, the Illinois Council Against Handgun Violence ("ICHV") applied for, and was issued, a Permit for Use of Space in Public Building and Grounds (the "Permit") to conduct a rally at the Federal Plaza, located at 230 South Dearborn, Chicago, Illinois. The

Permit granted ICHV permission to use the Federal Plaza to conduct its annual anti-handgun violence rally from 6:00 a.m. to 5:00 p.m. on Monday, October 7, 2002, as well as a "First Monday" event at noon. The rally was co-sponsored by the City and the Chicago Public Schools. First Monday events are scheduled to occur every first Monday in October, corresponding with the formal opening of the United States Supreme Court's fall term and upcoming November local, state and national elections. Many politicians attend First Monday events and speak against handgun violence to the assembled public and media. The First Monday events also host an anti-handgun violence essay contest for the area's children. Many children and teachers from the Chicago Public School System are bused in to attend the awards portion of this event.

In the past, plaintiffs have attended these rallies to protest the transportation of the students and teachers on school time and at taxpayers' expense as well as the Mayor's anti-handgun policies. Shortly before the rally began, John Risley, then serving as Commander in charge of the First Police District in Chicago, and other members of the Chicago Police Department instructed plaintiffs and various individuals associated with Concealed Carry to move to the side of the Federal Plaza behind a set of barricades. From that location, plaintiffs voiced their opinions throughout the rally.

Plaintiffs filed a seven-count first amended complaint, alleging that defendants violated plaintiffs' First, Fourth and Fourteenth Amendments rights in violation of 42 U.S.C. §§ 1983, 1985. Plaintiffs also alleged violations of numerous state law provisions. Plaintiffs sought an order enjoining defendants from acting in concert with one another to remove plaintiffs to the far end of the Federal Plaza at future ICHV rallies. Plaintiffs also sought to protest freely at future

First Monday Rallies, as well as a judgment declaring that defendants past removal of plaintiffs was unconstitutional. Plaintiffs sought damages and injunctive and declaratory relief.

Defendants filed a motion to dismiss the action, which this court granted in part and denied in part. *See Concealed Carry, Inc. v. City of Chicago, et al.*, 2003 WL 22283948 (N.D. Ill. Sept. 30, 2003). All requests for injunctive and declaratory relief were stricken from plaintiffs' first amended complaint, all official capacity claims were dismissed, and several defendants were dismissed from the lawsuit. The only remaining defendant is the City, and the surviving claims include First and Fourteenth Amendments claims under Count I (and the corresponding state claims under Count V) and section 1983 claims under Counts II and IV. These claims are addressed below.

## DISCUSSION

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1985). Initially, the moving party bears the burden of showing that the record contains no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The governing substantive law establishes which facts are material. *See Anderson*, 477 U.S. at 248. The non-moving party must present more than a "metaphysical doubt as to the material facts" to survive summary judgment. *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596 (1986). Additionally, "mere conclusory" allegations are not enough. *Nowak v. St. Rita High School*, 142 F.3d 999, 1002 (7th Cir. 1998).

3

The City objects to plaintiffs' Statement of Uncontested Facts Not Already Before the Court. While the court notes that the document is needlessly voluminous, contains substantial amounts of irrelevant material, and also makes numerous legal conclusions, all documents in the record have been reviewed, and all evidence has been taken into consideration as appropriate.

## I. Standing

The City asserts that plaintiffs do not have standing to raise the claims asserted in their first amended complaint. "The core component of standing is an essential and unchanging part of the case-or controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)). To establish standing, plaintiffs must show: (1) that plaintiff suffered an "injury in fact" — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical'"; (2) that a causal connection exists between the injury and the conduct complained of — the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court"; and (3) that it is "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61.

### A. John Birch

With regard to plaintiff Birch, the first requirement under the *Lujan* test is not met. Birch has not suffered any "injury in fact." Birch alleges no physical harm and admits in his response to the City's Statement of Undisputed Material Facts that he suffered no financial loss. He claims damages for emotional distress, but there is insufficient evidence in the record to support this claim.

4

As explained by the Seventh Circuit, "[t]his court has 'maintained a strict standard for a finding of emotional damage because they are so easy to manufacture.'" *Ruffin-Thompkins v. Experian Info. Sys*, 422 F.3d 603, 609 (7th Cir. 2005) (quoting *Sarver v. Experian Info. Solutions*, 390 F.3d 969, 971 (7th Cir. 2004)). "When the injured party's own testimony is the only proof of emotional damages, [he] must explain the circumstances of [his] injury in reasonable detail; [he] cannot rely on mere conclusory statements." *Id.*

Birch did not see any health care professional or have any physical symptoms resulting from his alleged emotional distress. Based on undisputed evidence, his emotional harm consists of "indignity" and some "stress and pressure and fear," and he simply feels that he was not treated right. Such statements are not sufficient under the strict standard for emotional damages maintained in this Circuit. Nor is this a case in which "the facts underlying the case are so inherently degrading that it would be reasonable to infer that a person would suffer emotional distress from the defendant's action." *Denius v. Dunlap*, 330 F.3d 919, 929-30 (7th Cir. 2003) (citations omitted) (plaintiff's assertions that he was "embarrassed and humiliated" did not fall into the inherently degrading category). Birch's claims for emotional damages fail as a matter of law.

Finally, as discussed more completely in the sections below, the City did not violate Birch's First or Fourteenth Amendment rights. Moreover, "[e]ven if we assume that the city's conduct would, in a proper case, be adjudged violative of the constitutional and statutory rights of the individuals affected, failure of plaintiffs to adequately demonstrate concrete and particularized injury to themselves still precludes standing." *HOPE, Inc. v. County of DuPage, Illinois*, 738 F.2d 797, 805 (7th Cir. 1984).

5

If there has been no "injury in fact," the second and third prongs of the *Lujan* test also fail. Without an "injury in fact," there can be no causal connection between that injury and the City's conduct (prong two), and there is no injury that is likely to be redressed by a favorable decision (prong three). Due to the fact that Birch's claims fail all three prongs of the *Lujan* test, this court concludes that he does not have standing.

B.     **Concealed Carry**

The City also asserts that Concealed Carry lacks standing. First, the court examines Concealed Carry's standing to bring these claims on its own behalf as a corporation. As discussed above, the first element required to establish standing is that the plaintiff, in this case a corporation, must have suffered an "injury in fact." A corporation is a legal entity. It can suffer no physical harm or emotional distress, and it is impossible for the police to physically move or segregate it. Moreover, no corporate financial losses have been alleged. Concealed Carry has suffered no "injury in fact" as a corporation and, therefore, lacks standing on its own.

The court next examines Concealed Carry's standing as a representative of its members. It is worth noting that "when the plaintiff is not [it]self the object of the government action or inaction [it] challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (citations omitted). An association has standing to bring suit on behalf of its members when it meets each of the three following criteria: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977).

However, before considering the elements set forth in *Hunt*, the court must consider as a threshold matter whether Concealed Carry qualifies as an association. It is not clear that Concealed Carry has any members. Birch states that "supporters" is the most appropriate term for those associated with Concealed Carry. According to the Supreme Court, indicia of a membership organization include three elements: (1) the supporters alone elect members of the organization, (2) the supporters alone may serve or participate in the organization, and (3) the supporters alone finance the organization's activities. *Hunt*, 432 U.S. at 344.

Looking to the first element, Concealed Carry's supporters do not vote on the corporation's membership; Birch alone elects himself as the entity's president every year, without input from anyone else. Second, there is no limitation on who can participate in the organizations's activities. The record shows that Birch is the only individual with any real responsibilities. No formal participation is required of anyone else, and any participation that does occur is open to anyone who reads the website. Third, the organization is not entirely financed by it supporters. Birch indirectly mentioned that there are no membership dues, and Concealed Carry also sells guns in order to raise funds. Based on the evidence before the court, Concealed Carry does not appear to demonstrate any of the characteristics that are representative of a membership organization.

"The Supreme Court has not seen fit to extend representational capacity standing to entities other than associations which actually represent interests of parties whose affiliation with the representational litigant is that of membership with the representative of substantial equivalent of membership." *HOPE*, 738 F.2d at 814. If it were correct that an association "could litigate on behalf of individuals that were neither its members nor the substantial equivalent of members, a conflict would be created with the prudential limitation that generally a

7

plaintiff 'cannot rest his claim to relief on the legal rights and interests of third parties.'" *Id.* at 815 (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

Even if Concealed Carry did qualify as a membership organization, it fails the first prong of the *Hunt* test laid out above, which requires that its members would otherwise have standing to sue in their own right. *See Hunt*, 432 U.S. at 343. As laid out above, Concealed Carry's members would not have standing to sue in their own right because there has been no demonstration that they suffered any injury in fact. "Since [the corporation] has not demonstrated that any party that it represents as a 'member' has standing, it cannot have standing as that member's representative." *HOPE*, 738 F.2d at 814.

Failure of any one of the *Hunt* factors means that Concealed Carry lacks standing as a membership organization. Thus, plaintiffs do not have standing. Although this finding is sufficient to grant the City's motion for summary judgment, the court proceeds with an analysis of each of plaintiffs' remaining claims, which provide additional grounds for granting the City's motion.

## II. First Amendment Claims

Plaintiffs claim that by being separated from the main portion of the Federal Plaza, their right of free speech was diluted and chilled. The court first notes that the analysis under Sections 4 and 5 of Article I of the Illinois Constitution, which deal with the rights to free speech and to assemble and petition, is the same as under the First Amendment of the United States Constitution. Therefore, plaintiffs' state and federal free speech claims will be discussed together. The court also notes that it is appropriate for this court to resolve this claim at the summary judgment stage of trial. "[T]he application of the First Amendment to the facts of a

8

particular case is not an issue for a jury to resolve, but is a legal question for the court to decide." *Potts v. City of Lafayette, Indiana*, 121 F.3d 1106, 1110-11 (7th Cir. 1997).

The right to free speech is fundamental but not absolute. *See Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508 (1969); *Potts*, 121 F.3d at 1111. "The privilege of a citizen of the United States to use the streets and parks for communication of views of national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in the subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied." *Potts*, 121 F.3d at 1111 (citing *Hague v. Committee for Indus. Org.*, 30 U.S. 496, 515-16 (1939)). Since plaintiffs were free to express their convictions outside of, but adjacent to, the primary area reserved for the ICHV rally, the central issue in the First Amendment claim is quite narrow: Did plaintiffs, in the exercise of their constitutional freedoms, have a right to express their views by intruding within an area reserved for another event still in progress? *See Sanders v. United States*, 518 F. Supp. 728, 729 (D.D.C. 1981).

The actions by the police at the rally were taken in furtherance of enforcing the City's permit system, and "[p]ermit systems are the embodiment of time, place, and manner restrictions that have long enjoyed the approbation of the Supreme Court." *Kroll v. United States Capitol Police*, 847 F.2d 899, 903 (D.C. Cir. 1988). Such time, place and manner restrictions over protected speech are valid, even in public forums, as long as three requirements are met: (1) the restrictions are justified without reference to the content of the regulated speech, (2) they are narrowly tailored to serve a significant governmental interest, and (3) they leave open ample alternative channels for communication of the information. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citations omitted).

Plaintiffs have failed to show that the City's actions violate any of these requirements. The court addresses each requirement in turn.

### A. Content Neutrality

The general standard for determining content neutrality is that government regulation of expressive activity is content neutral so long as "it is 'justified without reference to the content of the regulated speech.'" *Ward*, 491 U.S. at 791 (citations omitted). "The controlling consideration is the government's purpose in enacting the regulation. 'A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" *Potts*, 121 F.3d at 1111 (citing *Ward*, 491 U.S. at 791) (internal citations omitted).

The purpose of a permit system, such as that employed by the City of Chicago, is not to exclude activity based on the content of the message. Rather, it is to "coordinate multiple uses of limited space, to assure preservation of [public spaces], to prevent uses that are dangerous, unlawful or impermissible . . ., and to assure financial accountability for damage caused by [an] event." *Thomas v. Chicago Park District*, 534 U.S. 316, 322 (2002). It is true that the police officers were aware of the content of plaintiffs' message when the decision was made to segregate them, but that does not mean that the action was unconstitutional.

"[C]ontent-neutrality must govern the issuance of permits, but once issued, the permits may be enforced in a way that protects the expression of the permitted message, even to the exclusion of some other message." *Schwitzgebel v. City of Strongsville*, 898 F. Supp. 1208, 1219 (D. Ohio 1995). There is no evidence that the City's actions were motivated by disagreement with the content of plaintiffs' message. According to the facts before the court, the City was not trying to suppress that message. Rather, it was trying to provide structure and organization for

10

the manner in which the various messages were expressed. The record shows that the City granted Concealed Carry a permit to conduct a rally on the Federal Plaza on the first Monday of October 2003. Had that rally actually taken place, the police department most assuredly would have afforded plaintiffs the same courtesy provided to the holders of the ICHV rally permit, allowing plaintiffs' message to be expressed, and even protecting it from external intrusion and disruption.

The requirement for content neutrality has been satisfied.

### B. Narrowly Tailored to Serve a Significant Government Interest

The government most certainly has a significant interest at stake in these types of situations.

> The government interest here is twofold. The first concerns the safety, order, and convenience of those other citizens already participating in the preexisting event. . . . Secondly, and more fundamentally, is the interest in guaranteeing citizens the right to participate in events without being subjected to interference by other citizens.

*Sanders*, 518 F. Supp. at 729-30. Addressing the first of those two interests, "it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective." *Heffron v. International Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 651 (1981). It is of no consequence that plaintiffs' intrusion may have been peaceful and non-violent.

"In evaluating the justification for a regulation of the type at issue, the Court should not assess only the impact which would be caused by one party before the Court, but rather the impact which would be caused by all persons who would wish to invoke the right." *Sanders*, 518 F. Supp. at 729-30 (citing *Heffron*, 452 U.S. 640). The impact of numerous counter-demonstrators announcing their opposition to the rally through use of bullhorns could have the

11

potential of causing extreme commotion and chaos, which the City justifiably wished to prevent. "Regulations of the use of a public forum that ensure the safety and convenience of the people are not 'inconsistent with civil liberties but ... [are] one of the means of safeguarding the good order upon which [civil liberties] ultimately depend." *Thomas*, 534 U.S. at 323 (quoting *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941)).

The preservation of free speech, including the right to speak and to have one's message be heard, is undoubtedly a significant government interest.

> A physical intrusion into another event for the purpose of interjecting one's own convictions or beliefs is by definition an interference, regardless of how insubstantial or insignificant it might appear. As such, it is an interference with the rights of other citizens to enjoy the event or demonstration in which they have chosen to participate, and in an area reserved for them.

*Sanders*, 518 F. Supp. at 730. Segregating plaintiffs from the area reserved for the ICHV rally served to protect the First Amendment rights of the demonstrators who had obtained a permit. "To allow unregulated access to all comers could easily reduce rather than enlarge the [plaza's] utility as a forum for speech." *Thomas*, 534 U.S. at 322 (citing *Thomas v. Chicago Park District*, 227 F.3d 921, 924 (7th Cir. 2000)). Although plaintiffs contend that the segregation occurred prior to any act of interference, it was reasonable for the City to infer that supporters of Concealed Carry who brought bullhorns to an anti-handgun violence rally intended to interfere.

The court next turns to the "narrowly tailored" requirement of the analysis. "While time, place or manner regulations must [ ] be 'narrowly tailored' in order to survive First Amendment challenge, we have never applied strict scrutiny in this context." *Ward*, 491 U.S. at 800. "A requirement is narrowly tailored if 'the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Potts*, 121 F.3d at 1111. The Seventh Circuit further concluded: "So long as 'the means chosen are not substantially broader

12

than necessary to achieve the government's interest, [ ] the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.'" *Id.* at 1111-12.

The City's actions were by no means overly broad. As shown by the record, the individuals in question simply were told to move to another portion of the Federal Plaza. They were not forced to leave the premises, nor were they forced to remain silent and refrain from expressing their message. The City's action constituted a very narrow intrusion into their freedom of expression. The content, volume or duration of their message was not affected – only the location from which it came. Generally speaking, enforcement of a permit system is not a denial of liberty, but rather "a ministerial, police routine for adjusting the rights of citizens so that the opportunity for effective freedom of speech may be preserved." *Thomas*, 534 U.S. at 323 (quoting *Poulos v. New Hampshire*, 345 U.S. 395, 403 (1953)).

This court concludes that the City's actions were narrowly tailored to serve a significant government interest.

C. **Alternative Channels of Communication**

Plaintiffs certainly had ample alternative channels of communication available to them. First of all, based on the facts before the court, it is difficult to assert that plaintiffs were unsuccessful at communicating their message while at the ICHV rally. Birch admitted that the participants in the ICHV rally were able to hear his message and, in fact, responded to him. Supporters of Concealed Carry behind the barricades were able to talk to, and did talk with, passers-by during the rally and expressed their views. Birch was able to use his bullhorn to distract people's attention during the rally and was able to convey his message to the audience and participants. Birch wrote an e-mail stating that "[t]he fact is we blunted the rally and then

13

turned it to our advantage." In addition, the media focused on Birch at times, and he was able to give press interviews. Birch admitted in his Response to Defendant's Statement of Undisputed Material Facts that he was satisfied with his ability to communicate his message during the rally.

The record also shows that Concealed Carry communicates its message by, among other things, operating a website, holding speeches and rallies, writing letters to various media outlets, giving interviews to various media outlets, contacting legislators, making telephone calls and sending e-mails to various individuals and organizations, handing out fliers at gun shows, providing legal assistance to individuals arrested for firearms offenses, offering free firearms owner identification cards, and putting up billboards. "That the city's [actions] may reduce to some degree the potential audience for respondent's speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate." *Ward*, 491 U.S. at 802. Any reduction in plaintiffs' potential audience at the ICHV rally was inconsequential, and plaintiffs' alternative channels for communication are unquestionably more than adequate.

This court concludes that the City's actions at the rally did not violate plaintiffs' rights under the First Amendment of the Constitution.

## III. Fourteenth Amendment Claims

Plaintiffs argue that being segregated away from the permitted rally constituted impermissible content-based discrimination – they seek protection of their rights to assemble, speak, demonstrate and protest on an equal basis. This court notes that the equal protection analysis under the Illinois Constitution, Article I, Section 1, is the same as under the Fourteenth Amendment of the United States Constitution. *In re A.A.*, 181 Ill.2d 32, 36-37; *DeWoskin v. Loew's Chicago Cinema*, 306 Ill App. 3d 504, 517 (1st Dist. 1999). Therefore, plaintiffs' state and federal equal protection claims will be discussed together.

14

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). As an initial matter, a plaintiff must be able to identify a similarly situated group who was treated differently. However,

> [I]t is difficult to discern any equal protection violation in the circumstances of this case since [plaintiffs have] not demonstrated that [they] suffered unequal treatment--the essence of an equal protection violation is, after all, discrimination of some sort. We have previously held that a class of one claim must fail where the plaintiff has "failed to identify someone who is similarly situated but intentionally treated differently than he."

*Lunini v. Grayeb*, 395 F.3d 761, 769-70 (7th Cir. 2005) (quoting *McDonald v. Vill. Of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004)). Nowhere in the record do plaintiffs identify similarly situated individuals who have been treated differently by the City. Plaintiffs were not similarly situated to the permit-holding demonstrators, nor were they similarly situated to passive bystanders who had no intention of interrupting the ongoing ICHV rally. No other group has been identified who both lacked a permit and intended to interfere with the rally.

Additionally, there is no evidence to suggest that the Chicago Police Department always allows counter-demonstrators to interrupt permit-holding demonstrators as a general practice. *See Lunini*, 395 F.3d at 770. "Of course the law must provide some remedy for extreme abuses of power by public officials. However, absent some comparative showing of discrimination among similarly situated individuals or classes of individuals, such a remedy cannot be obtained via the Equal Protection Clause." *Lunini*, 395 F.3d at 770 n.5. The court recognizes that, as a general matter, whether individuals are similarly situated is a factual question for the jury. *Id.*

15

However, "when it is clear that no reasonable jury could find that the similarly situated requirement has been met, a grant of summary judgment is appropriate." *Id.* at 770 n.6 (internal citation omitted) (collecting cases).

Even if plaintiffs asserted that others present were similarly situated, their equal protection claims still fail. In determining the standard for judicial review in equal protection cases, the general rule is to apply "rational basis" scrutiny, meaning that "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 439-40 (collecting cases). However, if a suspect classification is used (generally race, alienage, national origin, or gender), or if a personal right protected by the Constitution is impacted, the law will be "subjected to strict scrutiny and will be sustained only if [it] is suitably tailored to serve a compelling state interest." *Id.* at 440 (collecting cases).

Although the parties apply the "rational basis" test, heightened scrutiny is appropriate in this case. "When government regulation discriminates among speech-related activities in a *public forum*, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized." *Carey v. Brown*, 447 U.S. 455, 461-62 (1980) (collecting cases) (emphasis added). The existence of a public forum is important, because "[i]n a public forum, by definition, all parties have a constitutional right of access and the state must demonstrate compelling reasons for restricting access to a single class of speakers, a single viewpoint, or a single subject." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 55 (1983).

Even using this heightened scrutiny standard, plaintiffs' claims still fail. As was discussed previously in the First Amendment section, the City's actions meet the requirement of

being finely tailored to serve substantial state interests. This was a narrow time, place and manner restriction that left open ample alternative channels of communication, and it also served the significant interests of maintaining order and safety and preserving the right to free speech.

This court concludes that plaintiffs' Fourteenth Amendment claims fail as a matter of law.

## IV. Section 1983 Claims

Plaintiffs assert a section 1983 violation based on a widespread custom or practice of being denied the right to express their viewpoint at First Monday rallies, and they name the Mayor as a person with final policy-making authority. Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.

First and foremost, a section 1983 claim requires that the plaintiff be deprived of something – plaintiffs must point to another source, either the United States Constitution or federal statutes, for the substantive rights they seek to enforce. *See Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979). In this case, plaintiffs allege to have been deprived of their First and Fourteenth Amendment rights. However, as has been discussed above, plaintiffs' rights guaranteed under the First and Fourteenth Amendments were not violated. Plaintiffs have not sufficiently demonstrated any deprivation on which to base a section1983 claim. Even if plaintiffs identified a right, privilege or immunity of which they

17

were deprived, their claim still fails. To maintain a section 1983 claim against a municipality, "one must establish the requisite culpability (a 'policy or custom' attributable to municipal policymakers) and the requisite causation (the policy or custom was the 'moving force' behind the constitutional deprivation)." *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691-94 (1978)).

> There are three things that a plaintiff can show in order to establish a policy or custom:
>
> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*Id.* at 537 (quoting *Baxter v. Vigo County School Corp.*, 26 F.3d 728, 735 (7th Cir.1994)). There is no evidence in this case that the City has an official policy or ordinance on crowd control at permitted events or that the City expressly authorizes violations of First and Fourteenth Amendment rights.

There also is not evidence of any widespread practice. There is no "one way" that the City responds in crowd control situations, and plaintiffs have not provided any evidence of multiple instances of improper crowd control techniques or violations of the First and Fourteenth Amendments. As the Seventh Circuit has noted, "[N]ormally random acts of isolated incidents are insufficient to establish a custom." *Gable*, 296 F.3d at 538 (quoting *Denno v. School Bd. of Volusia County, Fla.*, 218 F.3d 1267, 1277 (11th Cir. 2000)).

Even if plaintiffs identified a custom, "[i]n order for the plaintiffs to show that the alleged customs were attributable to the City and thus had the force of law, they must show that City policymakers were 'deliberately indifferent as to [their] known or obvious consequences.'" *Id.* at 537 (quoting *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 406-07 (1997)). "The

18

Supreme Court has defined deliberate indifference in this context to mean that 'a reasonable policymaker [would] conclude that the plainly obvious consequences' of the City's actions would result in the deprivation of a federally protected right." *Id.* (citing *Bd. of County Comm'rs*, 520 U.S. at 411). The City's approach to rallies of this sort was to allow Commander Risley, a well-trained and experienced law enforcement officer, to assess the specific circumstances of the situation and respond as he saw fit, with the help of a group of officers who were experienced in crowd control. This arrangement would not lead a reasonable policymaker to conclude that deprivation of federal rights would obviously occur.

Finally, no injury was caused by a person with final policymaking authority. The Mayor, named by plaintiffs as an individual with final policy-making authority, was not present at the rally, and plaintiffs admit that Commander Risley acted on his own authority, without consulting his superiors either prior to the event or in making his determination. Therefore, the Mayor could not have caused plaintiffs any injury during the rally. Moreover, in 2001, the Seventh Circuit concluded that superior officers of the Chicago Police Department did not qualify as "policymakers" for the City. *See Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001) (citing *Auriemma v. Rice*, 957 F.2d 397 (7th Cir. 1992)). As such, the court concludes that neither Commander Risley nor the other officers on site that day qualify as persons with final policymaking authority.

This court concludes that plaintiffs' claims under § 1983 fail as a matter of law.

## CONCLUSION

Defendant City of Chicago's motion for summary judgment [59] is granted. This is a final and appealable order, terminating the case.

It is so ordered.

                                                      Wayne R. Andersen
                                                     United States District Judge

Dated: September 28, 2006